UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| KENNETH LAMAR BUGG,<br><br>　　Plaintiff,<br><br>v.<br><br>PULASKI POLICE DEPARTMENT et al.,<br><br>　　Defendants. | Case No. 1:19-cv-00087<br><br>Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:　　The Honorable William L. Campbell, Jr., District Judge

### REPORT AND RECOMMENDATION

This civil rights action under 42 U.S.C. § 1983 arises out of pro se and *in forma pauperis* Plaintiff Kenneth Lamar Bugg's arrest and subsequent detention at the Giles County Jail in Pulaski, Tennessee. (Doc. No. 1.) Bugg, who appears pro se and *in forma pauperis*, brings claims against Defendants Pulaski Police Officers Corey Medley and Gerrod Shirey and Giles County, alleging that Medley, Shirey, and officials at the Giles County Jail were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. (*Id.*) The defendants have moved for summary judgment. (Doc. Nos. 53, 73.) Bugg has not responded in opposition to either motion. Considering the record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court grant the defendants' motions and enter summary judgment in their favor.

I. **Relevant Background**

　A. **Factual Background**[1]

On July 18, 2019, Corey Medley saw Kenneth Bugg riding as a passenger in a vehicle. (Doc. No. 77.) Medley knew that there was an active warrant for Bugg's arrest and initiated a traffic stop. (*Id.*) Bugg exited the vehicle before it came to a full stop and began to run away. (*Id.*) Medley pursued Bugg in his patrol vehicle, then continued the pursuit on foot through residential yards. (*Id.*) Medley ordered Bugg to stop running and told him that he would be tased if he did not stop. (*Id.*) Medley deployed his taser after seeing Bugg reach towards his waistline. (*Id.*) Bugg fell to the ground and obeyed the officers' commands to put his hands behind his back to be handcuffed. (*Id.*)

Bugg offered to remove a bandage he was wearing on his right hand and a brace he had on his left hand before being handcuffed.[2] (Doc. Nos. 76, 77.) Medley and Shirey do not recall Bugg stating that he had pain in his wrists and hands at that time or seeing any injuries to them. (Doc. Nos. 76, 77.) Because a taser had been deployed, Medley called paramedics to the scene to evaluate Bugg and to remove the taser prongs. (Doc. Nos. 77, 78.) Paramedics Danny Hardy and Kayla Schulte responded to the scene and evaluated Bugg. (Doc. Nos. 56-2, 56-3, 78.) Hardy and Schulte state that Bugg was combative and violent and that he did not report any wrist injuries. (Doc. Nos. 56-2–56-3, 68, 78.) Although Hardy and Schulte did not observe any abnormalities in Bugg's

---

[1] The facts in this section are drawn from the defendants' statements of undisputed material facts (Doc. Nos. 55, 78) and summary judgment exhibits (Doc. Nos. 56–56-4, 58–69, 75-1, 76–77-3), which include excerpts from Bugg's deposition transcript (Doc. Nos. 56-4, 75-1), Bugg's medical records and other documents from his detention at the Giles County Jail (Doc. Nos. 56-1, 58–69), and sworn declarations by Medley, Shirey, Captain Joseph Purvis, and paramedics Danny Hardy and Kayla Schulte (Doc. Nos. 56-1–56-3, 76, 77).

[2] A metal brace was logged among Bugg's personal property when he was booked into the Giles County Jail. (Doc. No. 56-1.)

vital signs or believe that he needed hospital care, they asked Bugg if he wanted to go to the hospital; Bugg said that he did not. (Doc. Nos. 56-2, 56-3, 68, 78.) Hardy and Schulte state that they did not observe any law enforcement officer deny Bugg medical attention or interfere with their ability to provide aid to Bugg. (Doc. Nos. 56-2, 56-3, 78.

Bugg was arrested on charges of evading arrest; possession of meth, marijuana, and drug paraphernalia; and violation of probation. (Doc. Nos. 55, 56-1.) He was brought to the Giles County Jail and booked into custody. (Doc. Nos. 55, 56-1.) Intake Officer Sergeant Melinda Ayers informed Bugg of the jail's policies and procedures, including the jail's procedure for filing grievances and medical requests. (Doc. Nos. 55, 56-1.) Pursuant to the jail's procedure, inmates may submit grievances and medical requests via a kiosk available in each pod. Inmates may appeal a decision on a grievance or request within three days of receiving a response. (Doc. Nos. 55, 56-1.) Bugg signed an acknowledgment of the grievance process and later testified that he was familiar with how to file a grievance. (Doc. Nos. 55, 56-1, 56-4.)

Sergeant Ayers also asked Bugg a series of health screening questions. (Doc. Nos. 55, 56-1.) She did not note any injuries that needed immediate attention, but observed that Bugg's wrist was swollen. Bugg said that the swelling was because "he was jumped" and tied up three weeks earlier and had not gone to the doctor. (Doc. No. 56-1, PageID# 276; Doc. No. 55.) The jail nurse was called to booking to look at Bugg's injuries and observed swelling in both wrists and a possible fracture in the right wrist. (Doc. Nos. 55, 56-1, 69.) The nurse noted that Bugg said he had been "jumped" by eight people two weeks earlier and had been tied up and beaten but had not seen a

doctor because he was "on the run[.]"[3] (Doc. No. 69, PageID# 340, Doc. Nos. 55, 56-1.) The nurse ordered an x-ray and gave Bugg ibuprofen. (Doc. Nos. 55, 56-1, 59, 69.)

A mobile x-ray taken the next morning showed fractures in both of Bugg's wrists. (Doc. Nos. 55, 56-1, 60.) Bugg was taken to the emergency department at Southern Tennessee Regional Health System the same morning, where his wrists were treated with immobilization and an ice pack. Bugg was given Tylenol and a prescription for ketorolac, a pain reliever. (Doc. No. 55, 56-1, 61.) Bugg was advised to follow up with Dr. Derek Riley in two to three days. (Doc. No. 55, 56-1, 61.)

Three days later, on July 22, 2019, Bugg was transported to a follow-up appointment with Dr. Riley. (Doc. No. 55, 56-1, 62.) Dr. Riley's treatment notes state that Bugg said he "was running from the police when [his] injury took place" and that it occurred on July 18, 2019. (Doc. No. 62, PageID# 325; Doc. Nos. 55, 56-1.) Bugg and Dr. Riley discussed treatment options and Bugg agreed to have surgery performed on both wrists.[4] (Doc. Nos. 55, 56-1, 62.)

On July 25, 2019, Bugg was transported to Southern Tennessee Regional Health System for surgery. (Doc. Nos. 55, 56-1, 63.) Dr. Riley's notes reflect that Bugg "states he injured his bilateral distal radius on 7/19, when he was running from the police, however, there was some callus on [the] x-rays[;]"Dr. Riley documented that he had to break up the callus during surgery.[5]

---

[3] During his deposition, Bugg also testified that he was robbed, beaten, and tied up about three weeks before his arrest. (Doc. No. 56-4.)

[4] On July 23, 2019, Bugg entered a medical request in the grievance system about a separate medical issue. (Doc. No. 56-1.) He did not mention a wrist injury in that medical request.

[5] Callus is "bony and cartilaginous material forming a connecting bridge across a bone fracture during repair. Within one to two weeks after injury, a provisional callus forms, enveloping the fracture site." The Editors of Encyclopedia Britannica, *Callus*, Britannica, https://www.britannica.com/science/callus-osteology (last visited Aug. 20, 2021).

(Doc. No. 63, PageID# 327; Doc. Nos. 55, 56-1.) Bugg was discharged on the same day with a prescription for Norco, a pain medication, and Phenergan, an anti-emetic, and was advised to keep his splints "on and clean, dry, [and] intact until [his] follow up visit" with Dr. Riley two weeks later. (Doc. No. 64, PageId# 332, Doc. Nos. 55, 56-1, 59.)

A nurse's note shows that, at 7:45 a.m. on the following day, a nurse gave Bugg his medication and discussed showers, "bathroom issues[,]" and the need for Bugg to keep his wrists wrapped for two weeks. (Doc. No. 65, PageID# 333.) Bugg entered a medical request at 10:51 a.m. that day stating that he "need[ed] to see [a] nurse about [his] hand and ice." (Doc. No. 56-1, PageID# 292.) The nurse's notes indicate that the nurse visited Bugg three more times that day to dispense medication, give Bugg ice, and reassure a "tearful" Bugg that "everything's going to be OK[.]" (Doc. No. 65, PageID# 333.) The nurse also noted that Bugg wanted to remove his splints and bandages. The nurse advised Bugg to keep them on until his follow up appointment with Dr. Riley. (Doc. No. 65.)

The nurse's notes from July 27, 2019, indicate that Bugg was "upset because he couldn't get any ice overnight[.]" The nurse stated that she would "discuss [this with the] nightshift [and] send email." (*Id.* at PageID# 334.) The notes reflect that the nurse visited Bugg five times that day to dispense medication, give Bugg a sandwich to help with nausea, help Bugg shower, and rewrap his splints after they got wet. (Doc. No. 65.)

On July 30, 2019, at 6:22 a.m., Bugg entered a medical request asking "Nurse Amanda" to arrange for him to be sent to a hospital for 24-hour assistance because he felt that he "c[a]n't do this" and that "no [correctional officer] will help." (Doc. No. 56-1, PageID# 292.) At 8:08 a.m., Nurse Amanda responded that Bugg had been asleep when she visited him that morning, but that she would follow up to get more specifics about what kind of help he needed. (Doc. No. 56-1.) A

nurse's progress note from July 31, 2019, states that Bugg "refused to [wear] braces on [his] arms[,]" "has removed them multiple times over the past 3 days[,]" and "has not worn them all day today." (Doc. No. 65, PageID# 334; Doc. No. 55.) The nurse noted that Bugg was "[a]dvised . . . to put them back on [and] . . . of the risks[,]" and that Dr. Riley's office was notified. (Doc. No. 65, PageID# 334.)

A post-surgical x-ray of Bugg's wrists was taken on August 2, 2019 (Doc. Nos. 55, 56-1, 66), and medical transportation forms show that Bugg was taken to follow up appointments with Dr. Riley on August 5, August 12, and August 26, 2019. (Doc. Nos. 55, 56-1.) On August 28, 2019, Bugg entered a medical request stating, "I need to see the nurse. Sometime today. My wrist feet and mouth." (Doc. No. 56-1, PageID# 292.) The record does not indicate that Bugg received a response through the jail's medical request system, but Bugg's medical records show that Bugg was prescribed ibuprofen and oragel that day. (Doc. No. 59.)

The jail's medical transportation records indicate that, after Bugg's August 26, 2019 appointment, he was set to follow up in one month. (Doc. Nos. 55, 56-1.) However, on September 24, 2019, Bugg refused to attend his appointment with Dr. Riley, and declined to give a reason. (Doc. Nos. 55, 67.) Bugg's detention at the Giles County Jail ended on September 26, 2019, when he was transferred to prison. (Doc. No. 55, 56-1.)

### B. Procedural Background

Bugg filed this action on October 28, 2019, while detained at the Bledsoe County Correctional Complex in Pikeville, Tennessee. (Doc. No. 1.) Bugg alleges that his wrists were broken when he fell to the ground after being tased during his arrest. (Doc. No. 1-1.) He states that the paramedics called to the scene saw his wrists and agreed that he "needed to go to the hospital now[,]" but that Shirey said they would "take him to the county jail and let the sheriff deal with him" instead. (Doc. No. 1, PageID# 8.) Bugg alleges that he told jail officials his wrists were

broken, that they responded that he should have been taken to the hospital, and that they did not give him an x-ray until two or three days after his arrest and told him that jail "procedure and protocol" required a second x-ray "for another opinion." (Doc. 1-1, PageID# 21.) Bugg claims that he was not taken to the hospital until two or three days after the first x-ray and did not have surgery until seven days after his arrest. (Doc. No. 1-1.) Bugg states that he filed grievances with the Giles County Sheriff's Department stating that he "was in pain and in fear of his life" and that he "needed to seek medical treatment because [his] wrist[s] were broken[.]" Bugg also states that his ability to file grievances was limited because he "was locked down" and was limited to filing six grievances a week. (Doc. No. 1, PageID# 7.)

The Court granted Bugg's application to proceed *in forma pauperis* and screened his complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A. (Doc. No. 5.) The Court dismissed Bugg's official capacity claims against Medley and Shirey, construed his claims against the Giles County Jail to be against Giles County itself, and found that Bugg had stated colorable claims against the defendants for deliberate indifference to his medical needs. (*Id.*)

Giles County filed a motion for summary judgment (Doc. No. 53), supported by a memorandum of law (Doc. No. 54), statement of undisputed material facts (Doc. No. 55), and various declarations and exhibits (Doc. Nos. 56–56-4, 58–69). Giles County argues that Bugg failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), because he did not file grievances or appeals regarding the issues raised in his complaint. (Doc. No. 54.) Giles County also argues that Bugg cannot establish that his constitutional rights were violated or that any violation was the result of a county policy or custom. (*Id.*) Medley and Shirey also filed a motion for summary judgment (Doc. No. 73), supported by a memorandum of law (Doc. No. 74), statement of undisputed material facts (Doc.

No. 78), and several declarations and exhibits (Doc. Nos. 75–77-3). Medley and Shirey argue that the undisputed facts show that they did not violate Bugg's constitutional rights and, alternatively, that Bugg's claims against them are barred by the doctrine of qualified immunity. (Doc. No. 74.)

The Court ordered Bugg to respond to both motions for summary judgment within twenty-eight days of service (Doc. Nos. 72, 80), then granted Bugg's request for an extension to respond to both motions by February 21, 2021 (Doc. No. 82). Bugg has not responded to either motion.

## II. Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

**III.     Analysis**

   **A.     Local Rule 56.01 and the Defendants' Initial Burden Under Federal Rule of Civil Procedure 56**

"Rule 56 first imposes a burden of production on the moving party to make a prima facie showing that it is entitled to summary judgment." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.1 (4th ed. updated Apr. 2021). "In this context, a 'prima facie' showing means that, in the absence of evidence to the contrary, the movant's evidence is sufficient to entitle the movant to summary judgment." 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.40 (3d ed. 2021). Courts must view the movant's evidence in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) ("[T]he moving party . . . ha[s] the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to

the opposing party."); *see also Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017) (viewing defendant's summary judgment evidence in light most favorable to plaintiff, finding it insufficient, and affirming, in part, district court's denial of summary judgment).

If the moving party's evidence is insufficient, "'[n]o defense . . . is required'" and summary judgment must be denied. *Adickes*, 398 U.S. at 161 (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* § 56.22(2) (2d ed. 1966)); *see also Evans*, 687 F. App'x at 446 (affirming, in part, denial of summary judgment where cited video evidence was insufficient to satisfy defendant's initial burden and plaintiff's opposition did not address that evidence); 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2727.1 (4th ed. updated Apr. 2021) ("If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response."). Under Rule 56(c)(3), the Court may also look to other materials in the record in its review. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("[A] court may consider record materials not called to its attention by the parties."). Accordingly, even though Bugg has not responded in opposition to the defendants' motions for summary judgment, the Court must independently examine the record evidence to determine whether the defendants have satisfied their burden to obtain summary judgment.

### B. Bugg's Claims Against Giles County

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies "is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing

*Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. The purposes of exhaustion "include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

Although the PLRA's exhaustion requirement "is a strict rule," it is subject to an exception. *Does 8–10 v. Snyder*, 945 F.3d 951, 962 (6th Cir. 2019). "'Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.'" *Id.* (alteration in original) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016)). An administrative remedy is available if it is "'capable of use to obtain some relief for the action complained of.'" *Id.* at 962–63 (quoting *Ross*, 136 S. Ct. at 1859). Conversely, an administrative remedy is not available when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates[;]" the "administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use[;]" or "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60. Failure to exhaust is an affirmative defense and defendants have "the burden to plead and prove [it] by a preponderance of the evidence." *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir.

2015). To prevail on an exhaustion defense at summary judgment, the defendants must establish "that no reasonable jury could find that [Bugg] exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)). If the defendants put forth evidence establishing that Bugg failed to exhaust his claims, Bugg must then "present 'significant probative evidence' to defeat the motion for summary judgment on this ground." *Napier v. Laurel Cnty.*, 636 F.3d 218, 225 (6th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).

Giles County asserts that Bugg has not exhausted his claim that jail officials were deliberately indifferent to his medical needs because Bugg did not file any grievances at the Giles County Jail regarding his medical needs. (Doc. No. 54.) The Giles County Jail's grievance policy provides that inmates submit grievances using a grievance tracker kiosk located in each pod, which is also used to submit medical requests. (Doc. Nos. 55, 56-1.) Inmates may log into the grievance tracker eight times in a seven-day period. (Doc. Nos. 56-1.) After an inmate receives a response to a grievance, he may appeal the decision within three days. (Doc. Nos. 55, 56-1.) Bugg received and signed a copy of the jail's grievance policy during intake (Doc. Nos. 55, 56-1), and he testified in his deposition that he was familiar with the jail's grievance procedures (Doc. No. 56-4).

Giles County has offered proof that Bugg filed four medical requests while detained at the Giles County Jail, but did not file any grievances or appeals regarding his medical treatment. (Doc. Nos. 55, 56-1.) Although the Sixth Circuit has held that medical requests may satisfy the PLRA's exhaustion requirement if the jail treats medical issues as "non-grievable[,]" *Rancher v. Franklin Cnty.*, 122 F. App'x 240, 242 (6th Cir. 2005), there is no evidence in the record that the Giles County Jail prohibited Bugg from filing grievances regarding his medical care. Bugg alleges in his complaint that his ability to file grievances was limited because he was only allowed to file six

grievances a week and because he was on lock-down (Doc No. 1), but the record shows that Bugg filed, at most, three medical requests in a single week. (Doc. No. 56-1.) Bugg did not file any medical requests about his wrist injuries until after he had surgery on July 25, 2019. (*Id.*) Bugg's ability to log in to the pod kiosk to submit medical requests also shows that any lock-downs that occurred did not prevent him from using the kiosk to file grievances.

Because Giles County has produced evidence showing that Bugg failed to exhaust his claims that jail officials were deliberately indifferent to his medical needs, Bugg must point to other record evidence to show that he did exhaust his grievances or that administrative exhaustion was not available to him. *See Napier v. Laurel Cnty.*, 636 F.3d at 225. Because Bugg has not responded to Giles County's motion for summary judgment, he has not met that burden. Giles County is entitled to summary judgment.

### C. Bugg's Claims Against Medley and Shirey

Bugg claims under § 1983 that Medley and Shirey acted with deliberate indifference to his serious medical needs by transporting him to the Giles County Jail instead of to a hospital after his arrest. "Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)).

The Eighth Amendment's prohibition on cruel and unusual punishment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Berkshire v. Beauvais*, 928 F.3d 520,

535 (6th Cir. 2019) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)). "Although the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (citations omitted). The Sixth Circuit applies "the same 'deliberate indifference' framework to Eighth-Amendment claims brought by prisoners as Fourteenth-Amendment claims brought by pretrial detainees." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020).[6]

A medical deliberate indifference claim against an individual actor has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Blackmore*, 390 F.3d at 895. The objective component requires showing the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (quoting *Blackmore*, 390 F.3d at 897). If the plaintiff's medical need is seemingly minor or non-obvious, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment,

---

[6] In *Griffith*, the Sixth Circuit considered "whether, in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), conditions-of-confinement claims brought under the Fourteenth Amendment" by pretrial detainees should be analyzed using an objective standard instead of the two-part analysis applicable to claims brought by convicted prisoners. 975 F.3d at 565. The court ultimately reserved that question after finding that the plaintiff could not prevail under either test. *Id.* at 570. Because Bugg has not satisfied the objective component of his deliberate indifference claim and thus could not prevail under either test, the Court need not consider *Kingsley's* applicability here.

federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004).

The subjective component requires a plaintiff to show that the official had "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). Courts determine this subjective component "'in light of the prison authorities' current attitudes and conduct.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). The Supreme Court has long held that this showing "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 896 (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

While Bugg's wrist fractures were a serious medical need, *see, e.g.*, *Gray v. Dorning*, No. 99-5212, 1999 WL 1336118, at *1 (6th Cir. Dec. 20, 1999), the uncontroverted evidence in the record shows that, at the time of Bugg's arrest, his injuries were not obvious and a lay person would not have recognized them as requiring immediate treatment. *See Richmond*, 885 F.3d at 938; *see also Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013) ("The ability to satisfy the objective prong with a showing that the injury was diagnosed by a physician who mandated treatment necessarily contemplates the diagnosis being made *before* the defendant's alleged deliberate indifference."). When Bugg was arrested, he was wearing a bandage on his right hand

and a brace on his left hand, but Medley and Shirey's uncontested declarations state that Bugg voluntarily removed the bandage and brace so that Medley could handcuff him. (Doc. Nos. 76, 77.) Medley, Shirey, and the two paramedics who responded to the scene of Bugg's arrest do not recall observing any injury to Bugg's wrists or hands or that Bugg stated that he had any pain in his wrists or hands. (Doc. Nos. 56-2, 56-3, 76, 77, 78.) When Schulte evaluated Bugg, she "made no observations of any abnormalities" in Bugg's vital signs and "did not make any observations leading [her] to believe that Mr. Bugg should be transported to the hospital." (Doc. No. 56-3, PageID# 296.) The paramedics offered to transport Bugg to the hospital, but Bugg declined. (Doc. Nos. 56-2, 56-3.) On this uncontroverted evidence, Medley and Shirey have satisfied their burden of showing that there is no genuine dispute of material fact that Bugg's injuries were not obvious when he was in their custody. *See Griffith*, 975 F.3d at 572 (holding that objective prong was not satisfied where "there [was] no evidence that [defendant] knew or should have known that" plaintiff's symptoms "evinced a substantial risk to his health[,]" even though plaintiff was later diagnosed with serious medical issue).

Because the evidence offered by Medley and Shirey tends to show that Bugg's need for medical treatment was not obvious while he was in their custody, Bugg must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d at 742. Bugg has not done so, and the other record evidence a does not indicate that being transported to the Giles County Jail instead of to a hospital caused Bugg to experience any detrimental health effects. *See Burgess*, 735 F.3d at 476–77 (affirming grant of summary judgment for defendants where plaintiff's facial and head fractures were non-obvious and plaintiff did not provide evidence that delay in treatment caused serious medical injury). Because there is no genuine dispute of material fact that Bugg's injuries were not

16
Case 1:19-cv-00087   Document 89   Filed 08/20/21   Page 16 of 17 PageID #: 441

obvious while he was in Medley and Shirey's custody and that Bugg did not experience detrimental health effects because of any delay in treatment, Medley and Shirey are entitled to summary judgment on Bugg's claims that they were deliberately indifferent to his serious medical needs.

**IV.    Recommendation**

For these reasons, the Magistrate Judge RECOMMENDS that the defendants' motions for summary judgment (Doc. Nos. 53, 73) be GRANTED and that judgment be entered in their favor.

If the District Judge adopts this Report and Recommendation and grants summary judgment for the defendants, the Magistrate Judge further recommends that Bugg's motion requesting a jury trial be DENIED AS MOOT.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 20th day of August, 2021.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge